**ETHICON, INC. and Inbae Yoon**

v.

**UNITED STATES SURGICAL CORP.**

**Civ. No. B–89–386(JAC).**

United States District Court,
D. Connecticut.

April 17, 1991.

David F. Dobbins, Harman A. Grossman, Richard H. Savage, Patterson, Belknap, Webb & Tyler, New York City, for plaintiffs.

Sanford M. Litvack, Clark E. Walter, Theresa M. Gillis, Dewey Ballantine, New York City, for defendant.

RULING ON CROSS–MOTIONS FOR PRELIMINARY INJUNCTION

JOSÉ A. CABRANES, District Judge:

### CONTENTS

I. INTRODUCTION ............................................................................................ 484
II. FINDINGS OF FACT .................................................................................... 485
   A. General Information—Parties ................................................................. 485
   B. General Information—Trocars ................................................................ 486
   C. '773 Patent ................................................................................................ 487
      1. Validity of the Patent .......................................................................... 487
         a. Was there a Prior Publication? ................................................... 487
         b. Was the Alleged Prior Publication "Enabling"? ....................... 489
         c. Is the Device Claimed in the '773 Patent Obvious in Light of the
             Markelov Prospectus? ............................................................... 490

        d.  Was there a Failure to Disclose the "Best Mode" for Practicing the Invention? 490
   2.  Infringement of the Patent 491
        a.  Does the Surgiport Infringe Claim 50 of the '773 Patent? 491
        b.  Does the Surgiport Infringe Claim 34 of the '773 Patent? 492
        c.  Does the Surgiport Infringe the '773 Patent Under the Doctrine of Equivalents? 492
   3.  Irreparable Harm to Plaintiffs 493
   4.  The Balance of Hardships/Good Faith 493
   5.  The Public Interest 494
  D.  '030 Patent 495
   1.  Validity of the Patent 495
        a.  Is the '030 Patent Obvious in Light of the '773 Patent? 495
        b.  Was There a Prior Public Use of the '030 Patent Before February 24, 1985? 495
   2.  Infringement of the Patent 496
        a.  Does the Endopath Infringe Claim 1 of the '030 Patent? 496
        b.  Does the Endopath Infringe the '030 Patent Under the Doctrine of Equivalents? 497
   3.  Irreparable Harm to Defendant 498
   4.  The Balance of Hardships/Public Interest 498
III.  DISCUSSION 498
  A.  '773 Patent 499
   1.  Likelihood of Success on the Merits 499
        a.  Validity 500
            (i)  Prior Publication 500
            (ii)  "Enabling" 501
            (iii) Obviousness 501
            (iv) Best Mode 501
            (v)  Summary 502
        b.  Infringement 502
            (i)  Claim 50 502
            (ii)  Claim 34 503
            (iii) Doctrine of Equivalents 504
            (iv) Summary 504
        c.  Conclusion 504
   2.  Irreparable Harm 504
   3.  Balance of Hardship 505
   4.  Public Interest 505
   5.  Summary 505
  B.  '030 Patent 505
   1.  Likelihood of Success on the Merits 505
        a.  Validity 506
            (i)  Obviousness 506
            (ii)  Prior Use 506
            (iii) Summary 507
        b.  Literal Infringement 507
            (i)  Triangular Base 507
            (ii)  Triangular–Shaped Opening 507
            (iii) Parabolically Shaped Bevels 508
            (iv) General Registry 508
        c.  Doctrine of Equivalents 508
        d.  Summary 509
   2.  Irreparable Harm 509
   3.  Balance of Hardships 509
   4.  Public Interest 509
   5.  Summary 509
IV.  CONCLUSION 510

This case concerns "trocars"—sharp-pointed surgical instruments used to establish a path of entry into an anatomical cavity through which a camera as well as other instruments may be inserted in order to perform minimally invasive surgical procedures. Prior to 1987, the only trocars generally available were reusable instruments made from stainless steel. Within the last ten years, doctors have improved the "classic" trocar by including a spring-loaded safety shield that snaps forward to cover the sharp point once the trocar has penetrated the anatomical wall. In addition to the safety shield, the parties to this action currently manufacture and sell trocars that are disposable, guaranteeing that the trocars are both sharp and sterile. The projected growth in the use of disposable safety trocars, particularly for procedures such as cholecystectomies (gall bladder removals), means that there is much at stake in determining who has the right to manufacture and sell these surgical instruments.

Ethicon, Inc. ("Ethicon") and Dr. Inbae Yoon ("Yoon") have brought this action against United States Surgical Corporation ("USSC"), and USSC has counterclaimed against plaintiffs. Plaintiffs seek a preliminary injunction that would enjoin defendant from continuing to sell all safety trocars currently being marketed under the name of "Surgiport" until it may be determined whether USSC has infringed U.S. Patent No. 4,535,773 (" '773 Patent"). Defendant has cross-moved for a preliminary injunction, claiming that Ethicon has infringed U.S. Patent No. 4,654,030 (" '030 Patent"), and USSC seeks an order enjoining Ethicon from continuing to sell all safety trocars currently being marketed under the name of "Endopath" and any other surgical trocars that employ the same safety shield configuration as the "Endopath."

After an evidentiary hearing lasting eleven days, the parties submitted post-hearing findings of fact and conclusions of law. After final argument on March 13, 1991, the motions were deemed submitted for decision.

## I. INTRODUCTION

This is a dispute between Ethicon and USSC, two leading manufacturers of medical and surgical devices. Dr. Inbae Yoon, a doctor and inventor of surgical instruments, entered into an agreement with Ethicon to license his patent for a trocar with a spring-loaded safety shield—the '773 Patent. USSC has marketed a disposable trocar with a spring-loaded safety shield since 1987, and in 1989, Ethicon sued USSC for infringement of Yoon's '773 Patent. USSC denies that it is infringing the patent and contends further that Yoon's '773 Patent is invalid.

Ethicon has filed a motion for a preliminary injunction which, if entered, would compel USSC to refrain from selling and manufacturing the Surgiport pending a final resolution of the dispute at trial. To grant Ethicon's motion for a preliminary injunction, the court must conclude: (1) that Ethicon is reasonably likely to succeed on its claims at trial; (2) that Ethicon can show that it is being irreparably harmed by USSC's conduct; (3) that the balance of hardships tips in Ethicon's favor; and (4) that the issuance of the injunction is in the public interest.

After a full evidentiary hearing and the submission of post-hearing memoranda of law, I have concluded the following:

(1) Ethicon is reasonably likely at trial to sustain its burden in showing that the '773 Patent is valid;

(2) Ethicon is *not* reasonably likely at trial to prevail on its claim of infringement;

(3) Ethicon has failed to show that it is being irreparably harmed by USSC's sale of the Surgiport;

(4) Ethicon has not shown that the balance of hardships tips *in its favor;* and

(5) Ethicon has not shown that this injunction would be in the public interest.

Therefore, Ethicon's motion for a preliminary injunction is denied.

USSC owns the rights to the '030 Patent, which describes a particular configuration of the trocar cutting head and the trocar safety shield. USSC claims that Ethicon's disposable trocar, the Endopath, infringes the '030 Patent because it uses the cutting head and safety shield covered by the patent.

USSC has filed a motion for a preliminary injunction which, if entered, would prevent Ethicon from selling and manufacturing the Endopath pending a final resolution of the dispute at trial. As in the case of the '773 Patent, the court must consider: (1) the likelihood that USSC will succeed on its claims at trial; (2) whether USSC is being irreparably harmed by Ethicon's conduct; (3) the balance of hardships; and (4) the public interest.

After a full evidentiary hearing and the submission of post-hearing memoranda of law, I have concluded the following:

    (1) USSC is reasonably likely at trial to sustain its burden in showing that the '030 Patent is valid;

    (2) USSC is *not* reasonably likely at trial to prevail on its claim of infringement;

    (3) USSC has failed to show that it is being irreparably harmed· by Ethicon's sale of the Endopath;

    (4) USSC has not shown that the balance of hardships tips in its favor; and

    (5) USSC has not shown that this injunction would be in the public interest.

Therefore, USSC's motion for a preliminary injunction is also denied.

## II. FINDINGS OF FACT

Based on the testimony presented at the evidentiary hearing and on the exhibits admitted in full during the course of the hearing, I hereby make the following findings of fact:

A. *General Information—Parties*

1. Yoon is a medical doctor who resides in Phoenix, Maryland. He is the inventor of the '773 Patent issued by the United States Patent and Trademark Office on August 20, 1985. The '773 Patent describes and claims a spring-loaded safety shield as part of a trocar.

    *See* Amended Complaint (filed Dec. 13, 1989) ("Complaint"), ¶¶ 3 & 7; Plaintiffs' Exhibit ("PX") 8 (Defendant's Exhibit ("DX") 44) ('773 Patent).

2. It is undisputed that Ethicon is a New Jersey corporation having its principal place of business in Somerville, New Jersey and that it is a wholly-owned subsidiary of Johnson & Johnson, Inc. engaged in the sale and manufacture of a variety of medical and surgical devices.

    *See* Complaint, ¶ 2.

3. Ethicon is the exclusive licensee of rights in the '773 Patent. Yoon licensed Ethicon in an agreement dated June 27, 1988 and amended on November 15, 1989.

    *See* PX 55 (License and Royalty Agreement); PX 56 (DX 46) (Agreement Amendment).

4. USSC is a Delaware corporation with its principal place of business in Norwalk, Connecticut. USSC sells and manufactures a variety of medical instruments, including surgical stapling devices and other minimally invasive surgical products.

    *See* testimony of Bruce Lustman (Oct. 16, 1990), Hearing Transcript ("Tr.") 532.

5. Since February 1987, USSC has manufactured and sold a line of surgical trocars with spring-loaded safety shields under the name "Surgiport." USSC's current Surgiport product line consists of 3mm, 5mm, 7mm, 8mm, 10mm, 11mm and 12mm size trocars.

    *See* testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 475–77; DX 70A (chart showing USSC's laparoscopic instruments); PX 3a (11 mm Surgiport); PX 3b (7 mm Surgiport); PX 3c (8 mm Surgiport).

6. In January 1990, Ethicon introduced its safety trocar, the "Endopath," in 5mm, 7/8mm and 10/11mm sizes.

    *See* testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 491–92; DX 70B (chart showing Ethicon's laparoscopic instruments).

7. EndoTherapeutics Corporation ("Endo") is a small California company that owns the rights to the '030 Patent. In April 1985, it began marketing the "Endo-

port," a disposable safety trocar. In June 1986, Endo entered into an exclusive licensing agreement with USSC for rights in the '030 Patent.

See PX 25 (DX 102) ('030 Patent); testimony of Dr. Frederic H. Moll (Oct. 24, 1990), Tr. 1272–73; DX 1 (License Agreement between Endo and USSC dated June 12, 1986).

B. *General Information—Trocars*

8. A trocar is a surgical instrument used to establish a path of entry into an anatomical cavity. It is used primarily in laparoscopy, a minimally invasive procedure whereby a small incision is made into the abdomen through which a tube is inserted, permitting the surgeon to introduce a camera or similar viewing system as well as surgical instruments into the cavity.

See testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 350; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 669.

9. The "classic" trocars consist of a tube (the cannula) and a cutting element (the obturator or stylet). The obturator, which fits within the cannula, is a shaft with a sharp piercing tip at its end. The "classic" trocar does not include a safety shield.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 59–60, 74.

10. To make the requisite hole, the trocar is pressed against the body until the obturator punctures the body wall and extends into the cavity. Once that is done, the surgeon removes the obturator, leaving the cannula protruding through the body wall so that instruments can be inserted to view internal organs, drain fluids or perform surgical procedures. More than one trocar is often used in a given procedure.

See DX 9 (Zucker & Bailey, *Atlas of Endo Cholecystectomy* 5 (1990)); testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 351; testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 479; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 675.

11. In laparoscopic surgical procedures, the wall of the body cavity is separated from the internal organs by the introduction of gas into the body cavity. This process is known as insufflation. Insufflation can be performed through a Verres needle prior to the insertion of a trocar or after insertion of the trocar by the introduction of gas through the outer jacket of the trocar.

See testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 359–61; PX 22 (Verres Needle); PX 5 (videotape of laparoscopic surgery performed with safety trocars).

12. There are a variety of surgical techniques, including choledoscopy, where trocars are used *without* insufflation.

See testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 384.

13. From 1962, when trocars were first used in laparoscopy, until 1987, the only trocars available on a wide-scale basis were reusable (or non-disposable) devices made from stainless steel.

See DX 9 (Zucker & Bailey, *Atlas of Endo Cholecystectomy* 1); testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 459–60; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 672–74.

14. Reusable trocars have several disadvantages, including the need to sharpen the piercing tip and the need to disassemble, sterilize and reassemble the device after each use.

See testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 459–61; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 672–74.

15. The "classic" trocars—those without safety shields—are potentially dangerous because they may perforate vital organs. At least three doctors claim to have developed a spring-loaded safety shield that represents a modification to the standard trocar: Dr. Sergei Markelov, who applied for a Soviet inventor's certificate for the spring-loaded safety trocar on February 4, 1980; Yoon, who applied for a U.S. Patent for his spring-loaded safety trocar on March 26, 1982; and Dr. Frederic H. Moll, who applied for a U.S. Patent on August 24, 1983.

See DX 18 (letter of Feb. 4, 1980 from Rector, Tselinograd Medical Institute to All–Union Scientific Research Institute

of State Expert Patent Analysis); PX 8 (DX 44) ('773 Patent); DX 101 (U.S. Patent No. 4,601,710); testimony of Dr. Frederic H. Moll (Oct. 24, 1990), Tr. 1244–45.

## C. '773 Patent

16. The '773 Patent discloses and claims products and methods relating to trocars with insufflation capacity and safety shields designed to prevent injury to body organs upon the trocar's penetration into the body cavity.

See PX 8 (DX 44) ('773 Patent).

17. One embodiment of the safety trocar appearing in Figure 1 of the '773 Patent discloses a cylindrical spring-loaded safety shield which encases the obturator or cutting shaft and which is in turn encased by the trocar's outer jacket. This embodiment of the invention is typical of the devices covered by Claim 50, and the associated method of use of this embodiment is typical of the methods covered by Claim 34 of the '773 Patent.

See PX 8 (DX 44) ('773 Patent).

### 1. Validity of the Patent

#### a. *Was there a Prior Publication?*

18. Dr. Sergei Markelov has been a surgeon for seventeen years, and he is a chief physician of the Tselinograd district in the Soviet Union. From 1978 to 1988 he was affiliated with the Tselinograd State Medical Institute ("Institute"), a hospital and medical teaching and research facility located in the city of Tselinograd within the republic of Kazakhstan. Kazakhstan is the second largest republic in the Soviet Union.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 52–54, 84–85; DX 12 (Markelov Autobiography); DX 41 (excerpt from Directory of Soviet Research Organizations).

19. During the period between 1978 and 1980, an American exhibition of modern agriculture was presented in Tselinograd. Americans visited the city during the period of the exhibition.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 56–57; DX 63 (copy of brochure entitled "Agriculture in the USA" used at exhibition in Tselinograd).

20. In early 1978, while working in the emergency hospital of the Institute, Dr. Markelov became concerned about the serious risk of perforation of internal organs posed by standard reusable trocars. Dr. Markelov conducted an extensive search of literature and patents from the USSR, United States, Great Britain, France, West Germany and Japan to determine if anyone had found a solution to this problem. Since he found that no one had provided an answer to the problem, Dr. Markelov proceeded to seek his own solution.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 63–65.

21. By March 1979, Dr. Markelov had designed and developed a safety trocar incorporating a spring-loaded safety shield that would spring into place to cover the cutting tip of the obturator upon penetration of the abdominal wall. Dr. Markelov explained that once the design was complete he had thirty instruments manufactured at a major manufacturing facility in Tselinograd, the Industrial Association Tselinogradselmash, so that he could test and use them in actual surgery.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 65, 68–69, 71; DX 15 (acknowledgement from factory to Dr. Markelov that thirty trocars were manufactured between February and March 1979).

22. Between March and September 1979, Dr. Markelov used his safety trocar in a number of successful operations in the emergency room of the Institute. In February 1980, the Institute assembled the materials needed to apply for an "inventor's certificate" and submitted them to the State Committee for Inventions ("State Committee"), the national Soviet agency that administers the Soviet Patent system.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 71–72, 76–79; DX 16 (Statement of Results for testing of the trocar for laparocentesis); DX 17 (statement of Conclusion from Secretary of Science and Patent Expert of the Institute); DX 18 (supporting letter from Rec-

tor of Institute to All–Union Scientific Research Institute of State Expert Patent Analysis).

23. Dr. John A. Martens is an expert on the Soviet patent system and on the Soviet system for managing scientific information. His testimony concerning the way the system itself functions was generally credible.

24. In the Soviet system, an inventor has the option to apply for either an "inventor's certificate" or a patent. If he chooses the former, he transfers all rights in the invention to the State and will receive only the "benefit" of public recognition. A patent, on the other hand, permits the inventor to retain the right to license his invention to the State, thereby receiving potential royalties. Both would give an inventor international priority according to applicable international conventions. If the criteria of patentability are established to the satisfaction of the State Committee, an inventor's certificate or patent will be issued.

See testimony of Dr. John A. Martens (Oct. 23, 1990), Tr. 1033–37.

25. The Center for Scientific and Technical Information ("CSTI") network, which came into existence in the 1960's, plays an important role in the rapid dissemination of new technological information through the Soviet system.

See testimony of Dr. John A. Martens (Oct. 23, 1990), Tr. 1024–28.

26. It is the responsibility of each CSTI, such as the Tselinograd Center, to distribute promptly to the other Centers all important technological information materials printed by them and the concurrent responsibility of all receiving Centers to index the material promptly for use by the interested public. The primary goal of the CSTI network is the speedy, effective dissemination of new scientific developments.

See testimony of Dr. John A. Martens (Oct. 23, 1990), Tr. 1024–25, 1053–54.

27. As of January 1981, there were 111 CSTIs dispersed geographically throughout the Soviet Union in such cities as Moscow, Leningrad, Riga, Kiev and Minsk.

See testimony of Vladimir Shevchenko (Oct. 22, 1990), Tr. 892; DX 71–A (map of Soviet Union indicating locations of CSTI centers as of January 5, 1981); DX 71–B (chart listing CSTI centers as of January 5, 1981).

28. These CSTI were open to and used by a broad cross-section of the Soviet public, including scientists, students, information specialists and engineers.

See testimony of Vladimir Shevchenko (Oct. 22, 1990), Tr. 902–03; testimony of Dr. John A. Martens (Oct. 23, 1990), Tr. 1047–48, 1060–62; DX 75 (article entitled "Certain Issues of Utilization of Patent Holdings Accumulated by the Inter–Branch Agencies for the STI"), table 3; DX 30 (affidavit of Pyotr Tarasov).

29. Mr. Pyotr Tarasov, the Director of the Tselinograd Center since 1973, states in his affidavit that the Markelov Prospectus was printed and disseminated to other CSTIs, in accordance with applicable laws, within 10 to 15 days of its January 5, 1981 printing. Because plaintiffs were unable to cross-examine Mr. Tarasov, I credit this affidavit only in so far as it corroborates Dr. Martin's testimony.

See DX 30 (affidavit of Pyotr Tarasov).

30. On July 18, 1980, the State Committee acknowledged receipt of the Institute's application for an inventor's certificate, naming Dr. Markelov as inventor. This acknowledgment confirmed that the date on which the application was received was June 17, 1980. This is the key date for establishing priority of invention.

See testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 79; DX 19 (acknowledgement from State Committee of the USSR for Inventions and Discoveries).

31. In mid–1980, after the State Committee acknowledged Dr. Markelov's application, Dr. Markelov prepared a written document which he called a "prospectus." He sent copies of this document, which contained drawings of his trocar and a description of its operation, together with some manufactured safety trocars, to approximately eight doctors within the Soviet Union for their review and use. He encouraged these physicians to utilize the tro-

cars and report back to him. He placed no obligation of secrecy of any kind upon the doctors. He received letters back from several colleagues.

> *See* testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 80–82, 84–89; DX 20 (prospectus entitled "Trocar for Laparocentesis"); DX 21 (letter from Dr. Voronezh to Dr. Markelov, Oct. 9, 1980); DX 22 (letter from "Petya" to Dr. Markelov, Jan. 3, 1981).

32. In late 1980, after receiving favorable reports from his colleagues, Dr. Markelov prepared a second prospectus describing his device ("Markelov Prospectus"). He did this in order to disclose to physicians and others on a broader scale both how the device worked and how it could be made. He had this second prospectus printed at an official publishing house, the Tselinograd Center for Scientific and Technical Information ("Tselinograd Center"). He gave one of his trocars to an expert draftsperson who prepared a drawing of the instrument for inclusion in the prospectus.

> *See* testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 90–96; *id.* (Sept. 27, 1990), Tr. 144.

33. The Tselinograd Center printed the prospectus on January 5, 1981. Dr. Markelov requested and received 150 copies of his prospectus so that he could personally distribute them to interested physicians and scientists.

> *See* testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 91, 96–97; DX 23 (prospectus entitled "Trocar").

34. Dr. Markelov's personal copy of the Markelov Prospectus indicates that only 150 copies were printed. It is undisputed, however, that this exhibit is a copy of one of the original 150 prospectuses printed by the Tselinograd Center for Dr. Markelov's personal use. If additional copies had subsequently been printed, this fact would not be indicated on the back of one of the original 150 copies.

> *See* DX 23 (Markelov Prospectus); testimony of Dr. Regina Jouk (Oct. 24, 1990), Tr. 1169–71.

35. Dr. Markelov sent about 20 or 30 prospectuses to physicians in major areas of the USSR. In addition, he disseminated his prospectus to approximately forty doctors, professors and medical students at a February 20, 1981 meeting of the Tselinograd Surgical Society (the "Society"), an organization of about 100 surgeons practicing in the Tselinograd region.

> *See* testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 97, 99–100.

36. At the meeting of the Society, Dr. Markelov demonstrated his safety trocar, distributed copies of his prospectus, and answered questions from the other members. At the conclusion of the meeting, the Society voted to recommend Dr. Markelov's trocar for broad use in surgical practice.

> *See* testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 99–102; DX 24 (excerpts from transcript of the Society's meeting on February 20, 1981).

### b. *Was the Alleged Prior Publication "Enabling"?*

37. Dr. Stephen J. Tricamo is Head of the Mechanical Engineering Department at the Stevens Institute of Technology, in Hoboken, New Jersey. He is an expert in mechanical design, design of machine components, and design of mechanical systems. His testimony concerning whether someone skilled in the art could make the device described in the Markelov Prospectus was generally credible. Professor Ernesto E. Blanco, Adjunct Professor in the Department of Mechanical Engineering, Division of Design, of the Massachusetts Institute of Technology, is an expert in the design of surgical instruments. However, his testimony concerning whether a person skilled in the art of making surgical instruments could construct a trocar by reading the Markelov Prospectus, including the illustration, text, and description of the purpose of the instrument, was generally not persuasive.

> *See* DX 43 (curriculum vitae of Dr. Stephen J. Tricamo); testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 727–30; *See* PX 6 (curriculum vitae of Professor Ernesto E. Blanco).

38. The illustration of the trocar included in the Markelov Prospectus is not drawn to scale. It does not contain an indicated scale that would permit one to use the drawing alone to make a model of the trocar.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 738; DX 84 (excerpt from J. Duff, *Problems in Industrial Technical Illustration* 2).

39. One skilled in the art of making surgical instruments would examine the illustration contained in the Markelov Prospectus in light of the entire disclosure. The device described is a surgical trocar to be used in laparocentesis, as indicated in the written text of the document. One skilled in the art would have knowledge of the reusable trocars in use at the time of the Markelov invention.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 741–43.

40. The illustration of the trocar contained in the Markelov Prospectus contains certain "gaps," but these are conventional exaggerations that one skilled in the art of making surgical instruments would recognize as a means of clarifying both that spaces between the structures exist and that the structures themselves have certain thicknesses. In light of the purpose of this type of trocar, one skilled in the art would know that there could not be wide gaps if the device were to perform as intended.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 742–43; DX 85 (excerpt from T. French & C. Vierck, *A Manual of Engineering Drawing for Students and Draftsmen* 220 (1953)).

c. *Is the Device Claimed in the '773 Patent Obvious in Light of the Markelov Prospectus?*

41. The testimony of Professor Ernesto E. Blanco on the question of whether the device claimed in the '773 Patent (the "Yoon trocar") was obvious in light of the Markelov Prospectus was generally credible. The testimony of Dr. Stephen J. Tricamo on this question was unpersuasive.

42. In the Markelov Prospectus, the trocar safety shield is retained within the cannula after it pierces the body wall because "stops" connected to the shield run up against the end of the grooves in the cannula. This is an "external" mechanism for stopping the safety shield from falling out of the open end of the cannula. In the Yoon trocar, the shield is restrained internally because of a reduction in the diameter of the cannula.

*See* testimony of Professor Ernesto E. Blanco (Oct. 25, 1990), Tr. 1482–87; PX 8 (DX 44) ('773 Patent), fig. 1.

43. Because of these grooves, the device claimed by the Markelov Prospectus (the "Markelov trocar") cannot be used, by itself, for procedures requiring insufflation.

*See* testimony of Professor Ernesto E. Blanco (Oct. 15, 1990), Tr. 230–31; testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 391; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 708.

44. However, the Markelov trocar may be adapted for use in insufflation.

*See* testimony of Dr. Sergei Markelov (Sept. 27, 1990), Tr. 170–71; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 708.

45. All of the embodiments shown in the '773 Patent reveal an outer jacket that completely encloses the safety shield, suggesting that the Yoon trocar was intended to prevent the leakage of fluid, both liquid and gas.

*See* testimony of Professor Ernesto E. Blanco (Oct. 15, 1990), Tr. 237–38.

d. *Was there a Failure to Disclose the "Best Mode" for Practicing the Invention?*

46. When Yoon filed his patent application, he believed that there would be less risk of injury to internal organs if the safety shield did not lock rigidly over the cutting tip, but rather, was flexible (but not so much as to expose the cutting tip) when it came into contact with internal organs.

*See* PX 109 (DX 91) (deposition testimony of Dr. Inbae Yoon (Apr. 5, 1990), at 215–16).

47. There are advantages in having a safety shield that does *not* lock automati-

cally. For example, were a trocar to lock prematurely, "tenting" might occur when the blunt end of the safety shield is unable to pierce the peritoneum. This could cause tearing and other trauma to the peritoneum.

*See* testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 399, 401.

48. Each of the commercial embodiments of the safety trocar—the Surgiport marketed by USSC and the Endopath marketed by Ethicon—incorporates safety shield locking devices.

·*See* testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 466–67; testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 402.

2. Infringement of the Patent

a. *Does the Surgiport Infringe Claim 50 of the '773 Patent?*

49. Dr. Stephen J. Tricamo's testimony concerning whether USSC's Surgiport infringes Claim 50 of the '773 Patent was entirely credible. To the extent that Professor Ernesto E. Blanco's testimony contradicted that of Dr. Tricamo on the question of infringement of Claim 50, it was not persuasive.

50. In order for a safety shield to permit "longitudinal interior passage" of the obturator, the obturator must be insertable and removable from the shield.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 756–58.

51. The drawings and specification of the '773 Patent confirm that the safety shield of the Yoon trocar permits "longitudinal interior passage" of the obturator by having a shield which is part of and fastened to the cannula.

*See* PX 8 (DX 44) ('773 Patent), fig. 1.

52. In the Surgiport, the obturator and safety shield are joined as a unit, and the cannula is wholly separate. Hence, unlike the Yoon embodiment, the obturator in the Surgiport does not—indeed, it cannot—pass through the safety shield, as required by Claim 50.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 755–58.

53. To provide a proper channel through the body, the obturator of the trocar must be removed.

*See, e.g.,* testimony of Dr. Sergei Markelov (Sept. 26, 1990), Tr. 60.

54. When the drafters of the '773 Patent intended to describe movement "back and forth"—when, for example, they described the movement of the safety shield between the accommodating means (cannula) and the shaft (obturator)—they used the words "reciprocating longitudinally." When they intended to describe the shield's capacity to have the obturator go in *and out,* they used the words "longitudinal interior passage."

*See* PX 8 (DX 44) ('773 Patent), col. 26, lines 54–56; testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 756, 819–21.

55. The Yoon embodiment was intended to have an obturator that passed through both the shield and cannula. Figure 1 of the '773 Patent depicts a device where the obturator would be inserted in and removed from the shield and cannula. The Yoon prototype confirms the conclusion that the "longitudinal interior passage" phrase in the Claim means a device where the obturator passes into and out of the cannula/shield unit.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 755–58; PX 8 (DX 44) ('773 Patent), fig. 1; DX 60 (Yoon Prototype).

56. In the case of USSC's Surgiport, the safety shield is removed from the cannula with the obturator.

*See* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 768; *see also* PX 3a (11mm Surgiport); PX 3b (7mm Surgiport); PX 3c (8mm Surgiport).

57. Figure 28C of the '773 Patent does not show a device where the safety shield is removed from the cannula. It shows how the Yoon trocar may be assembled. It does not expand, or alter, the claim as written.

*See* PX 8 (DX 44) ('773 Patent), col. 15 lines 43–48; testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 765–68.

### b. Does the Surgiport Infringe Claim 34 of the '773 Patent?

58. Dr. Stephen J. Tricamo's testimony concerning whether USSC's Surgiport infringes Claim 34 of the '773 Patent was entirely credible. To the extent that Professor Ernesto E. Blanco's testimony contradicted that of Dr. Tricamo on the question of infringement of Claim 34, it was not persuasive.

59. Claim 34 describes how to use the Yoon trocar, not how to manufacture it.

See testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 858; DX 83 ('773 File Wrapper), Amendment at 11.

60. Claim 34 of the '773 Patent was expressly amended to require "inserting an elongate implement having a sharp distal end axially into said [receiving] *elongate* member *and said reciprocating member*...." In order to infringe Claim 34, the Surgiport would have to be used in such a way that the obturator is inserted into both the cannula and the safety shield at the same time.

See DX 83 ('773 File Wrapper), Amendment at 5 (emphasis added); *see also* testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 859–60.

61. The obturator and safety shield of the Surgiport are manufactured as a single unit. The surgeon would never have occasion to "insert" the obturator of the Surgiport into the safety shield.

See testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 850–51, 860.

### c. Does the Surgiport Infringe the '773 Patent Under the Doctrine of Equivalents?

62. The '773 Patent is not a wholly novel device. Its incorporation of a safety shield is a significant improvement to the "classic" trocars already in use, but the Yoon trocar is not of such novelty and importance as to mark a distinct step in the progress of the art.

See PX 109 (DX 91) (deposition testimony of Dr. Inbae Yoon (Apr. 6, 1990), at 360).

63. The advantages of the safety shield in the Yoon trocar are primarily psychological. There is no medical evidence that it saves lives or avoids injury.

See testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 389.

64. The basic difference between the Surgiport and the Yoon trocar is that in the Surgiport, the safety shield and obturator are a single unit; unlike in the Yoon trocar, neither the safety shield nor the obturator can be removed without the other.

See testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 755–56.

65. By removing the shield from the cannula, the Surgiport leaves a wider path of entry for endoscopes and other instruments. In order to use the same size instruments as with the Surgiport, a surgeon would be required to use a Yoon trocar with a larger diameter. The room taken up by the safety shield would require an increased wound size of up to 20%.

See testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 682–83; testimony of Dr. Stephen J. Tricamo (Oct. 18, 1990), Tr. 760.

66. The Yoon trocar, in which the safety shield protrudes beyond the cannula while in the body, permits air leakage at the juncture of the cannula and shield. If the shield/cannula unit is not inserted far enough into the abdomen, this juncture may be positioned so that the gas leaks into the abdominal wall, thereby causing a painful condition known as subcutaneous emphysema.

See testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 680.

67. Because the safety shield in the Yoon trocar remains in the body and extends about one centimeter beyond the end of the cannula, the shield impairs the operative viewing field. This is especially so if the Yoon instrument is pushed further into the body to prevent the leakage described above, *see* Findings of Fact, No. 66.

See testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 679–80.

68. The protruding spring-loaded safety shield found in the Yoon embodiment may cause tissue that is being removed during

an operation to become dislodged and subsequently lost in the abdomen.

*See* testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 683.

69. Because the cutting tip and safety shield in the Surgiport are a single unit, the cutting tip is protected when the obturator is removed from the cannula. In contrast, the cutting tip of the Yoon embodiment is exposed upon removal from the cannula, thereby creating risks of cutting operating room personnel and transmitting viral infections.

*See* testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 681.

### 3. Irreparable Harm to Plaintiffs

70. USSC had been the only company selling disposable safety trocars before Ethicon entered the market. Even now that Ethicon's Endopath is competing with the Surgiport, USSC has approximately 95% of the total market. If a company is alone in the market with a good product, surgeons become accustomed to the product, grow to depend on it, and grow accustomed to buying it. This product acceptance is "goodwill" that money cannot buy.

*See* testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 494, 500–03.

71. Surgeons are generally reluctant to try an equivalent product once they have become accustomed to using a particular product.

*See* testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 355–56.

72. USSC promotes the use of its Surgiports together with its Endo Clip Applier for use in laparoscopic gall bladder removals ("cholecystectomies"), a relatively innovative procedure which allows patients to undergo major surgery with minimal cosmetic scarring and activity restrictions. The Endo Clip Applier may also be used with Ethicon's Endopaths.

*See* testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 480–82; testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 422.

### 4. The Balance of Hardships/Good Faith

73. USSC initially became interested in the possible development of a disposable safety trocar as a result of its contact with Endo in 1985. Endo had developed a disposable safety trocar, called the Endoport, which it had begun to market in 1985. Recognizing the potential for a disposable trocar and believing that the product would fit well with its line of disposable surgical stapling devices, USSC entered into negotiations with Endo for a license to the product. This effort culminated in an exclusive license agreement dated June 12, 1986.

*See* PX 4 (DX 104) (Endoport); testimony of Bruce Lustman (Oct. 16, 1990), Tr. 534–35; DX 1 (License Agreement between Endo and USSC dated June 12, 1986).

74. USSC worked on developing and redesigning the Endoport and planning its introduction on a national scale. Finally, in February 1987, USSC introduced a new, re-designed safety trocar—the Surgiport.

*See* testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 465–76.

75. In the summer of 1987, several months after the national introduction of the Surgiport, Yoon approached USSC and asserted that the device infringed his '773 Patent.

*See* testimony of Bruce Lustman (Oct. 16, 1990), Tr. 536–37.

76. In October 1987, USSC and Yoon reached an agreement on the essential terms of a license, which was confirmed in writing in March 1988. USSC believed that it shortly would have a formal written agreement.

*See* testimony of Bruce Lustman (Oct. 16, 1990), Tr. 537–40; DX 4 (letter from Attorney Presta to Attorney Libsohn dated March 11, 1988 confirming agreement); PX 111 (DX 58) (deposition testimony of Frank R. Presta (Dec. 5, 1989), at 92–96, 102–05); PX 110 (DX 92) (deposition testimony of Thomas R. Bremer (Apr. 24, 1990), at 111–15).

77. In March 1988, at about the same time he was negotiating the agreement

with USSC, Yoon contacted Ethicon about a possible license.

See DX 48 (confidential Disclosure Agreement between Yoon and Ethicon (Mar. 1, 1988)); DX 49 (letter from Yoon to Dr. Alan Levy dated March 4, 1988).

78. Yoon reached an agreement with Ethicon in June 1988.

See PX 55 (License and Royalty Agreement).

79. In early 1989, Yoon, acting through new counsel, and with the knowledge of Ethicon, contacted USSC and advised it of the 1988 agreement with Ethicon and of his willingness and ability to grant USSC a non-exclusive license. This was the first notice USSC had of the fact that Yoon had negotiated an agreement with Ethicon.

See testimony of Bruce Lustman (Oct. 16, 1990), Tr. 541–42; DX 5 (letter from Attorney Goldstein to Leon Hirsch dated February 7, 1989).

80. In March 1989, representatives of USSC met with Yoon's lawyers, who informed them that Yoon had entered into a non-exclusive licensing agreement with Ethicon and was free and eager to enter into a similar agreement with USSC.

See testimony of Bruce Lustman (Oct. 16, 1990), Tr. 542–55.

81. In June 1989, Mr. Lustman and Mr. Bremer from USSC met Yoon in Washington, D.C. The parties agreed on the amount of a license fee, the commencement date of royalties (with Yoon free to select either of two options), and the royalty rate.

See testimony of Bruce Lustman (Oct. 26, 1990), Tr. 546–55; DX 6 (Mr. Lustman's notes written at June 14, 1989 meeting).

82. It is undisputed, however, that no formal agreement had been reached at the June 1989 meeting. Plaintiffs filed this suit in July 1989. They filed their motion for a preliminary injunction in August 1990.

See PX 110 (DX 92) (deposition testimony of Thomas R. Bremer (Apr. 24, 1990), at 159–60).

83. In September 1989, after Ethicon had filed suit, USSC sent a proposed draft of an agreement to Yoon offering $2.2 million in paid-up royalties for five years and 5% on sale, for the rest of the life of the patent. In October 1989, Yoon entered into the Amended License Agreement with Ethicon.

See PX 104 (proposed license agreement between Yoon and USSC dated September 20, 1989); PX 56 (DX 46) (Agreement Amendment).

5. The Public Interest

84. USSC has conducted seminars and teaching sessions to familiarize surgeons with its disposable trocar.

See testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 481–82, 495; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 686–87; DX 9 (Zucker & Bailey, Atlas of Endo Cholecystectomy (1990)).

85. USSC has educated more than ten thousand obstetricians, gynecologists, and general surgeons in the use of the Surgiport. Annual sales of the product have gone from about $5 million in 1987 to more than an estimated $50 million in 1990, as a result of USSC's efforts.

See testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 482, 485, 495.

86. USSC has effectively developed the market for disposable safety trocars in this country, and its product is by far the predominant trocar in the market. Laparoscopy has become one of the most rapidly growing areas of surgery.

See testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 494; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 671–72.

87. USSC has introduced a cannula made out of special radiolucent material, which allows surgeons to obtain unobstructed x-rays during surgery, thereby enhancing patient safety. This is not available in Ethicon's product line.

See testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 478, 492–93; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 676–77; DX 70A (chart showing USSC's laparoscopic instruments); DX 70B (chart showing Ethicon's laparoscopic instruments).

88. Ethicon's Endopaths come in 7/8 mm and 10/11 mm sizes, permitting surgeons to use different size instruments through a single trocar without having to attach an adapter. This flexibility makes the Endopaths somewhat more convenient to use.

See testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 376.

89. While there are differences between USSC's Surgiport and Ethicon's Endopath, these differences are not significant. While surgeons may prefer one over the other, they are for most purposes interchangeable.

See testimony of Dr. Martin Weisberg (Oct. 16, 1990), Tr. 386; testimony of Dr. Karl Zucker (Oct. 17, 1990), Tr. 703–04.

90. Were USSC forced to discontinue the sale and manufacture of its Surgiport pending trial, the disruption of substantial long term relations with its customers could spill over and affect other USSC products because of hospital purchasing procedures. Furthermore, such an injunction could mean the loss of jobs by as many as 350 factory employees.

See testimony of Bruce Lustman (Oct. 16, 1990), Tr. 568–72; testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 496–97.

D. *'030 Patent*

91. On February 9, 1990, USSC asserted a counterclaim charging plaintiff Ethicon with infringement of the '030 Patent. USSC charges that the Endopath, which Ethicon began to market and sell in January 1990, infringes the '030 Patent.

See Answer to Amended Complaint and Amended Counterclaims (filed Feb. 14, 1990), ¶¶ 109–15.

92. The '030 Patent was issued to Endo on March 31, 1987. Endo had applied for the patent on February 24, 1986.

See PX 25 (DX 102) ('030 Patent).

93. The '030 Patent claims a safety trocar having a pyramidal cutting head and safety shield with a triangular-shaped opening—a design intended to reduce the force required for the safety trocar to penetrate the body wall.

See testimony of Dr. Frederic H. Moll (Oct. 24, 1990), Tr. 1258; testimony of Dr. Stephen J. Tricamo (Oct. 25, 1990), Tr. 1347.

1. Validity of the Patent

a. *Is the '030 Patent Obvious in Light of the '773 Patent?*

94. Dr. Stephen J. Tricamo's testimony that the '030 Patent is obvious in light of the '773 Patent was generally credible. To the extent that Professor Ernesto E. Blanco's testimony contradicted that of Dr. Tricamo on the question of the obviousness of the '030 Patent, it was not persuasive.

95. The '030 Patent teaches that the shield retracts to the base of the cutting head and that the opening conforms to the base of the cutting head. Neither the '773 Patent nor any other art discloses either of those features.

See testimony of Dr. Stephen J. Tricamo (Oct. 25, 1990), Tr. 1347–1350, 1706–07; PX 8 (DX 44) ('773 Patent); DX 101 (copy U.S. Patent No. 4,601,710); PX 25 (DX 102) ('030 Patent); DX 121A (photograph of Endoport tip); DX 122A (photograph of Endopath tip).

96. During prosecution of the application for the '030 Patent, the patent examiner reviewed both the '030 Patent and U.S. Patent No. 4,601,710 ("'710 Patent"), an earlier Moll patent. The '710 patent is cited in the '030 Patent as prior art. The invention of the '030 Patent was found patentable over the tapered tubular shield shown in the '710 Patent.

See testimony of Dr. Stephen J. Tricamo (Dec. 18, 1990), Tr. 1704–05; DX 101 ('710 Patent); PX 25 (DX 102) ('030 Patent).

b. *Was There a Prior Public Use of the '030 Patent Before February 24, 1985?*

97. Dr. William Kennett used an Endoport safety trocar (the product practicing the '030 Patent) in performing a clinical procedure on February 8, 1985. Dr. Philip Darney used Endoports in three clinical procedures on February 15, 1985. These tests were necessary experiments to ascer-

tain the viability of the device in actual surgery on humans. Endo's records, including the reports received and the evaluations made, confirm the non-public nature of these uses.

> *See* testimony of Dr. Frederic H. Moll (Oct. 24, 1990), Tr. 1260–72; DX 109 (reports of clinical tests of Endoport); DX 110 (report by Dr. William Kennett of clinical test of Endoport); DX 111 (report by Dr. Philip D. Darney of clinical test of Endoport).

98. The circumstances and contexts of the tests, including Dr. Moll's and the other physicians' presence and supervision, reveal that the tests were experimental in nature and intended to be confidential.

> *See* testimony of Dr. Frederic H. Moll (Oct. 24, 1990), Tr. 1262–72, 1321–22.

99. The first time Dr. Moll showed a prototype of the trocar to anyone other than those advising Endo was at the annual meeting of the Association of Operating Room Nurses, held on February 25, 1985. No one from Endo solicited any sales or took any orders either at or prior to the meeting. The first Endoport trocars, other than those exclusively used for test purposes, were not made until April 1985.

> *See* testimony of Dr. Frederic H. Moll (Oct. 24, 1990), Tr. 1272–73.

### 2. Infringement of the Patent

#### a. *Does the Endopath Infringe Claim 1 of the '030 Patent?*

100. Professor Ernesto E. Blanco's testimony concerning whether the Endopath infringes Claim 1 of the '030 Patent was credible. To the extent that Dr. Stephen J. Tricamo's testimony contradicted that of Professor Blanco on the question of the Endopath's infringement of Claim 1 of the '030 Patent, it was not persuasive.

101. Claim 1 is limited to a device whose cutting head has a triangular "base." The base is the planar figure articulated by three line segments, each of which marks the boundary between the planar side surface of the cutting head and the planar side of the shaft below it. In other words, the '030 specification shows that there is a triangular "base" where

each of the three planar surfaces of the pyramidal cutting head intersects with a planar side of the shaft. The three lines of intersection define a triangular cross-section, which is the "base."

> *See* testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1600; PX 25 (DX 102) ('030 Patent).

102. The surfaces of the cutting head of the Endopath merge smoothly into the cylindrical shaft. There is no intersection of planes—there are no line segments to define a triangular base where the cutting edges terminate.

> *See* testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1600.

103. A person of ordinary skill in the art would not consider the cutting tip of the Endopath to have a triangular base simply because a hypothetical triangular cross-section connecting the points where the three cutting edges terminate could be drawn.

> *See* testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1600–01; PX 2b (10/11 mm Endopath).

104. A triangle is a two-dimensional figure formed by three intersecting straight lines. A triangle has length and width, but no height.

> *See* testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1594, 1596.

105. A person skilled in the art would not describe the cross-section of the opening of the Endopath safety shield as a triangular-shaped opening. The opening of the Endopath safety shield is cut into a sphere.

> *See* testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1594, 1599.

106. The "bevels" on the Endoport safety shield have substantially the same slopes as the surfaces of the cutting head and they act as extensions of those surfaces when the shield is retracted. This is exactly what is embodied in the Endoport safety trocar pursuant to the '030 Patent.

> *See* PX 25 (DX 102) ('030 Patent), col. 3, lines 27–31; PX 4 (Endoport); testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1615–17.

107. The Endopath's safety shield contains rounded "bulges" at its distal end. A bulged or curved surface cannot be said to have a slope. The surface of each bulge has a constantly changing or infinite number of slopes.

> See testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1615–16; PX 2b 65 (10/11 mm Endopath).

108. The rounded bulges on the Endopath's safety shield are not "generally parabolically shaped." A parabola is a two-dimensional figure which corresponds to a cross-section of a cone.

> See PX 34 (model of cross-section of a cone); testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1618, 1631–32.

109. The opening of the Endopath safety shield cannot be said to be formed by the bases of the three parabolic bevels. The opening of the Endopath's shield is not formed by imaginary lines but rather by three arcs corresponding to the periphery of the inside surface of each of the three rounded bulges.

> See testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1618, 1631.

110. General registry means coincidence of the periphery of two figures.

> See testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1601–05.

111. The device claimed by the '030 Patent (the "Moll trocar" or Endoport) shows that the triangular shield opening aligns perfectly with the triangular base. Each edge of the opening is parallel and adjacent to the base, such that the three lines defining the opening of the shield and the three lines defining the base of the cutting tip are so aligned that they could be superimposed upon each other.

> See PX 25 (DX 102) ('030 Patent), fig. 8; testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1668–69; PX 28 (model of '030 tip and shield).

112. When the Endopath's shield is retracted to its fullest extent, the tip of each of the three arcs of the rounded bulges touches an imaginary line formed by connecting points at the proximal end of the two cutting edges that define each slope of the cutting head. Three points of contact are insufficient for "general registry."

> See testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1610–11.

b. *Does the Endopath Infringe the '030 Patent Under the Doctrine of Equivalents?*

113. The Moll trocar has a safety shield with a triangular opening the edges of which have a certain width. These "ledges" create a discontinuity in the cutting process during insertion. Once the surgeon has inserted the Moll trocar up to the ledges of the safety shield, the cutting process is over, and the ledged shield expands the hole until it reaches the maximum diameter.

> See testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1636–37.

114. The tip of the Endopath's safety shield does not have ledges. The transition from the cutting head to the cannula is made over the shield's three rounded bulges which are separated by gaps at the shield's distal end. Expansion over the bulges is smoother than forcing a triangular ledge through the insertion being cut by the sharp edges of the cutting head. The Endopath's "bullet-nosed" safety shield reduces trauma to tissue during penetration, even though the bulged safety shield requires more force to penetrate.

> See testimony of Professor Ernesto E. Blanco (Dec. 18, 1990), Tr. 1637–38.

115. The testimony of James V. Martin, Director of Operations of Ethicon and former project manager for the development of the Endopath, was generally credible concerning the development and purpose of the Endopath.

116. Ethicon had two design purposes with respect to the Endopath's "bullet-nosed" safety shield. First, the Endopath's shield was designed to reduce the trauma to surrounding tissue by distributing over a greater area the force exerted by the safety shield. Second, Ethicon sought to improve safety by decreasing the time needed for the safety shield to snap forward to cover the cutting tip upon penetration of the body wall. By decreasing

the distance that the safety shield retracts and by increasing the force of the spring, the speed with which the safety shield snaps forward is increased. This has the disadvantage of increasing the force needed to retract the safety shield.

See testimony of James V. Martin (Dec. 18, 1990), Tr. 1553–57, 1569–70.

117. The force needed to retract fully the safety shield of the Endopath is less than that needed to retract the safety shield of the Surgiport. However, the Endopath requires a greater maximum force to penetrate than is required by a Surgiport of comparable size.

See testimony of James V. Martin (Dec. 18, 1990), Tr. 1587–90; DX 136 (memorandum entitled "Ethicon Endopath–Porvair Penetration Characteristics"); see also testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 523.

118. An advertisement for the Endopath claims that it was "designed for easy penetration." This refers to the minimization of trauma to surrounding tissue, not the reduction in the force required to penetrate the body wall. Ethicon never intended to suggest, and the advertisement itself never suggests, that reduction in penetration force was a design goal.

See testimony of James V. Martin (Dec. 18, 1990), Tr. 1559–62; DX 124 (Endopath advertisement).

119. Ethicon's European patent application for the Endopath never mentions that the purpose of the Endopath is to reduce penetration force.

See testimony of John V. Martin (Dec. 18, 1990), Tr. 1566–70; DX 126 (Ethicon European Patent Application).

3. Irreparable Harm to Defendant

120. USSC has exclusive rights to the '030 Patent, see Findings of Fact, No. 7, but it does not practice the '030 Patent. In other words, the Surgiport's safety shield does not align itself with the base of the cutting head, and the shield's opening is not triangular-shaped. Like the Moll trocar, the Surgiport reduces penetration force, but it does so through an alternative design.

See testimony of Dr. Stephen J. Tricamo (Oct. 25, 1990), Tr. 1367–70.

121. It is likely that USSC's market share will be reduced by Ethicon's continued sale of the Endopath.

4. The Balance of Hardships/Public Interest

122. Were the injunction against Ethicon to enter, USSC would be the sole presence in the disposable trocar market until Ethicon is able to develop an alternatively designed cutting tip and safety shield.

123. USSC has a full line of trocar products and is currently, and has been consistently, able to supply the market for disposable safety trocars. There is currently no trocar model or size offered by Ethicon that is not included as part of USSC's product line.

See testimony of Lee R. Cohen (Oct. 16, 1990), Tr. 492.

III. DISCUSSION

Both parties invoke the court's authority under federal patent law to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (1988). After eleven days of testimony and over one-hundred exhibits, it is easy to forget that we have not had a full trial on the merits. The court's findings with respect to the underlying issues of validity and infringement of both the '773 and '030 Patents are unavoidably tentative, and they have been made for the sole purpose of resolving the pending motions for preliminary injunction. See University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Despite how it may appear, I intimate no view whatsoever on the underlying merits of the complaint and counterclaim in this action. See Illinois Tool Works, Inc. v. Grip–Pak, Inc., 906 F.2d 679, 681 (Fed.Cir.1990) (preliminary injunction lies within sound discretion of district court "after a hearing in which neither party [is] required to prove his case in full and in light of findings and

conclusions *not binding* at trial" (emphasis in original)).

■ The standards for awarding a preliminary injunction are "no more nor less stringent in patent cases than in other areas of the law." *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987). A party seeking a preliminary injunction must establish a right thereto in light of four factors:

> 1) a reasonable likelihood of success on the merits; 2) irreparable harm; 3) the balance of hardships tipping in favor of the requesting party; and 4) that the issuance of an injunction is in the public interest.

*Chrysler Motors Corp. v. Auto Body Panels, Inc.,* 908 F.2d 951, 952 (Fed.Cir.1990); *see also Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed.Cir.1988); *T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equip., Inc.,* 821 F.2d 646, 647 (Fed.Cir.1987).

No one of these factors is dispositive. The Court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech,* 849 F.2d at 1451. The absence of an adequate showing with regard to any one factor may be sufficient, "given the weight or lack of it assigned to other factors, to justify the denial" of the preliminary injunction. *Chrysler,* 908 F.2d at 953.

**A. '773 Patent**

To prevail on their motion for preliminary injunction, plaintiffs must show that (1) there is a reasonable likelihood that they will prove at trial by a preponderance of the evidence that defendant has infringed the '773 Patent and that they will carry their burden on the question of the patent's validity; (2) they are currently being irreparably harmed; (3) the balance of hardships tips in their favor; and (4) the issuance of a preliminary injunction is in the public interest.

**1. Likelihood of Success on the Merits**

■ A patent is presumed valid. 35 U.S.C. § 282 (1988). The movant, therefore, need not prove affirmatively that the patent is valid. On a preliminary injunction motion, "[t]his presumption of validity places the burden of persuasion as well as the burden of going forward on the party asserting invalidity." *Chrysler,* 908 F.2d at 953. Once the alleged infringer makes out a *prima facie* case of invalidity, the burden shifts to the patentee to establish validity. *U.S. Environmental Products, Inc. v. Westall,* 911 F.2d 713, 716 (Fed.Cir. 1990); *TP Laboratories, Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 971 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984).

■ When a patentee "clearly shows" that the patent is infringed, "a court may, after a balance of all of the competing equities, preliminarily enjoin another from violating the rights secured by the patent." *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985). Proof of patent infringement must be shown by a preponderance of the evidence. *Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed. Cir.1985).

■ The interpretation of the claims of a patent is a question of law. *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). The court is to interpret words in a claim according to ordinary meaning absent evidence that the inventor used them differently. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1579 (Fed.Cir.1988). "[I]t is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). The purpose of the patent system is to provide clear notice to others of what would constitute infringement. *United Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 232, 63 S.Ct. 165, 167, 87 L.Ed. 232 (1942); *Great Northern Corp. v. Davis Core & Pad Co.,* 782 F.2d 159, 166 (Fed.Cir.1986).

500

a. *Validity*

(i) Prior Publication

■ Although the party defending against a claim of infringement by challenging the patent's validity ultimately has the burden of proving invalidity at trial "by clear and convincing evidence," *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985), on a motion for a preliminary injunction, plaintiffs "retain the burden of showing a reasonable likelihood that the attack on [the] patent's validity would fail." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987). The defendant's challenge to the validity of the '773 Patent rests primarily on the existence of the Markelov Prospectus which defendant claims is a prior "printed publication" within the meaning of 35 U.S.C. § 102(b).[1] There is no dispute that Yoon filed the '773 Patent Application on March 26, 1982, making March 26, 1981 the relevant date for the question of prior publication.

The section 102(b) bar is grounded in the principle that "once an invention is in the public domain, it is no longer patentable by anyone." *In re Hall*, 781 F.2d 897, 898 (Fed.Cir.1986). Public accessibility is the touchstone when determining whether a document constitutes a "printed publication" that would bar a patent under 35 U.S.C. § 102(b). *Id.* at 899; *In re Bayer*, 568 F.2d 1357, 1359 (C.C.P.A.1978). The question is whether defendant has shown that the Markelov Prospectus was "sufficiently accessible, at least to the public interested in the art, so that such a one by examining the reference could make the claimed invention without further research or experimentation." *In re Hall*, 781 F.2d at 899.

In *In re Hall*, the Court of Appeals for the Federal circuit considered whether a doctoral thesis submitted to the Department of Chemistry and Pharmacy at Freiburg University in what used to be called the Federal Republic of Germany was "suf-

ficiently accessible" to the public. In the absence of evidence establishing a specific date of cataloguing and shelving, the court concluded that "competent evidence of the general library practice may be relied upon to establish an approximate time when a thesis became available." *Id.*

In *Freeman v. Minnesota Mining & Mfg. Co.*, 693 F.Supp. 134 (D.Del.1988), *aff'd in part and vacated in part on other grounds*, 884 F.2d 1398 (Fed.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1794, 108 L.Ed.2d 794 (1990), the court confronted a factual situation remarkably similar to the one in this case. In *Freeman*, the question was whether an extract from the records of a clinical conference of the Moscow Experimental Laboratory for Experimental Eye Surgery (now the Moscow Eye Institute, ("MEI")) held in 1975 was sufficiently accessible to invalidate a subsequent patent. The party alleging invalidity sought to prove that the extract was publicly accessible by relying on evidence offered by the head of the MEI who testified that "he was at the conference, that the report was given to a librarian, and that it was indexed and shelved shortly after the conference." *Id.* at 149. The court rejected this argument, concluding that "[t]here is no reliable evidence that the library was open to the public in 1975, nor is there any evidence that the Protocol was actually indexed and shelved in the library in 1975." *Id.* In light of the presumption of validity, the court held that there was not "clear and convincing evidence of the accessibility of a one-page document in a library in an [i]nstitute in Moscow such that it would anticipate Freeman's patent under Section 102(b)." *Id.*

Based on the substantial record before me, I conclude that plaintiffs have met their burden of showing that it is reasonably likely that the attack on the '773 Patent's validity would fail. *See H.H. Robertson*, 820 F.2d at 387. Defendant has taught the court much about how scientific

1. The relevant portion of section 102(b) reads as follows: "A person shall be entitled to a patent unless ... the invention was patented or described in a printed publication in this or a

foreign country ... more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1988).

information is disseminated throughout the Soviet Union, but it was unable to show that the Markelov Prospectus was actually catalogued and indexed according to the regulations in place. Although the court in *In re Hall* suggested that there is no absolute requirement that specific indexing and cataloguing information be available, *In re Hall*, 781 F.2d at 899, there was no dispute that the doctoral dissertation was eventually placed in the library—the only question was *when* it was actually catalogued. In contrast, the defendant in this case has only been able to offer evidence suggesting how the system was *designed* to work. *See* Findings of Fact, Nos. 25–26.

The dissertation at issue in *In re Hall* could be found in the library of the University of Freiburg; a paper distributed to at least six people, which the court in *Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1108–09 (Fed.Cir. 1985), found to be prior art, was delivered to an international conference in the United States (Birmingham, Alabama). With no credible evidence that the Markelov Prospectus was actually disseminated and publicly available in the Soviet Union prior to March 26, 1981, I simply cannot conclude that it constituted a prior "printed publication" within the meaning of 35 U.S.C. § 102(b) sufficient to invalidate the '773 Patent.

### (ii) "Enabling"

Because I have found that the Markelov Prospectus was not sufficiently available to the relevant public to qualify as a prior printed publication, it is not necessary to reach the question of whether or not it would have permitted someone skilled in the art to " 'recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.'" *In re Wyer*, 655 F.2d 221, 226 (C.C.P.A.1981) (quoting *I.C.E. Corp. v. Armco Steel Corp.*, 250 F.Supp. 738, 743 (S.D.N.Y.1966)); *see also In re Donohue*, 766 F.2d 531, 533 (Fed.Cir.1985). However, the credible evidence presented

at the hearing was that the Markelov Prospectus would have permitted one skilled in the art to build the claimed invention—a trocar with a safety shield. *See* Findings of Fact, Nos. 37–40.

### (iii) Obviousness

■ Section 102(b) bars an application for patent only if the "complete invention claimed was embodied in or obvious in view of the thing" described in the prior printed publication. *Timely Products Corp. v. Arron*, 523 F.2d 288, 302 (2d Cir.1975); *see also In re Corcoran*, 640 F.2d 1331, 1333 (C.C.P.A.1981) (quoting *Timely Products* approvingly). The question is whether there are any "material" differences between the Yoon trocar and the invention disclosed in the Markelov Prospectus. *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1565 (Fed.Cir.1987).

Even if the Markelov Prospectus were deemed to be a prior "printed publication" under 35 U.S.C. § 102(b), the credible evidence presented at the hearing indicates that the Markelov Prospectus discloses a device materially different from the Yoon trocar. *See* Findings of Fact, Nos. 41–45. In particular, the external mechanism for stopping the safety shield would prohibit the use of the Markelov trocar alone for any procedures requiring an air-tight valve assembly. It is clear from the '773 Patent itself that the Yoon trocar was designed to prevent the leakage of fluid, both liquid and gas. *See* Findings of Fact, No. 45. For this reason, I find that the Markelov Prospectus does not disclose a device that anticipates the Yoon trocar.

### (iv) Best Mode

Finally, defendant argues that the '773 Patent is invalid because it did not disclose a safety shield locking mechanism which, according to defendant, violates the "best mode" doctrine of 35 U.S.C. § 112.[2] The purpose of this requirement is "to ensure that the public, in exchange for the rights given the inventor under the patent laws, obtains from the inventor a full disclosure of the preferred embodiment of the inven-

---

**2.** The relevant portion of section 112 reads as follows: "The specification shall ... set forth the best mode contemplated by the inventor of

carrying out his invention." 35 U.S.C. § 112 (1988).

tion." *Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 418 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Defendant appears no longer to be pressing this argument. *Compare* Defendant's Pre–Hearing Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (filed Aug. 31, 1990) at 14–15 *with* Defendant's Post–Hearing Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (filed Dec. 4, 1990) at 3–12. In any event, the credible testimony at trial shows that, at least at the time Yoon applied for the patent, there was some doubt concerning the "best mode" of practicing the invention. *See* Findings of Fact, Nos. 46–48.

### (v) Summary

For the reasons stated above, I find that plaintiffs are likely to succeed at trial in proving by a preponderance of the evidence that the '773 Patent is valid.

### b. Infringement

In order to establish that the Surgiport infringes a claim of the '773 Patent, Ethicon would have to show at trial that each element of the claim is found in the Surgiport. In interpreting patent claims, the court ought to give words their ordinary meaning unless there is evidence that the inventor intended to use them differently. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579 (Fed.Cir.1988); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753,

759 (Fed.Cir.1984). Plaintiffs have limited their infringement action to Claims 50 and 34 of the '773 Patent.

### (i) Claim 50

■ Both parties are in agreement that the only issue on the question of *"literal"* infringement of Claim 50[3] is whether the phrase "longitudinal interior passage" means that the safety shield must permit the obturator to be inserted and removed from the shield or whether the phrase means that the shield must permit the obturator to *move* back and forth within the shield.[4] Plaintiffs assert that there is nothing in the language of Claim 50 discussing the *removal* of the obturator, and they insist that defendant is purporting to add an additional element to the Claim that would affirmatively require that the obturator be removed from both the cannula and the safety shield. "Modification by mere *addition* of elements of functions, whenever made, cannot negate infringement without disregard of the long-established, hornbook law...." *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984) (emphasis in original).

Defendant rejects this characterization of its defense, arguing that the plain language of element 3 of the Claim means that the obturator can be removed from the safety shield—something that simply cannot be done with the Surgiport. Based on

**3.** Claim 50 reads as follows:

A surgical instrument for providing communication through an anatomical organ structure, comprising:
[1] means having a shaft terminating in a sharp distal end for puncturing an anatomical structure when subjected to force along the longitudinal axis of said shaft;
[2] means having a length less than a length of said *puncturing means, including a first* sleeve defining a first lumen for accommodating *longitudinal interior passage* of said puncturing means through said first lumen;
[3] shielding means including a second sleeve *defining a second lumen permitting longitudinal interior passage* of said shaft inside said second lumen, having a bearing surface at its distal end protrusible beyond the distal end of said first lumen, said bearing surface tapering radially inward to form a

close fit around said shaft, for reciprocating longitudinally within said first lumen between said accommodating means and said shaft; and
[4] means contacting said shielding means for biasing a section of the distal end of said shielding means to protrude beyond the distal end of said first lumen and permitting said section of said shielding means to recede towards the proximal end of said accommodating means when said bearing surface is subjected to force along its longitudinal axis.

PX 8 (DX 44) (copy of '773 Patent), col. 26, lines 36–63 (emphasis added).

**4.** *See Post Trial Brief of Plaintiffs* (filed Nov. 20, 1990) ("Plaintiffs' Brief on '773 Patent") at 1; Defendant's Post–Hearing Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction (filed Dec. 4, 1990) ("Defendant's Memorandum on '773 Patent") at 12.

the credible evidence presented at the hearing, *see* Findings of Fact, Nos. 49–57, I am persuaded that the Surgiport does not infringe Claim 50 of the '773 Patent. "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure *with the disclosed structure*, and must find equivalent *structure* as well as *identity* of claimed *function* for that structure." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 & 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). In light of the fact that the Yoon trocar was intended to have an obturator that passed through both the shield and cannula, *see* Findings of Fact, No. 55, the credible evidence presented at the hearing indicates that the phrase "longitudinal interior passage" means a device where the obturator passes into and out of the cannula/shield unit. This interpretation is justified further by the fact that when the drafters of the patent specifically intended to mean "back and forth" movement, they used the phrase "reciprocating longitudinally." *See* Findings of Fact, No. 54.

### (ii) Claim 34

■ As in the case of Claim 50, the parties are in essential agreement on the precise question with respect to the infringement of Claim 34 [5]: Does the Claim require the obturator to be inserted into the cannula and into the safety shield *at the same time?* [6] Plaintiffs rely on the proposition that "[i]nfringement is not avoided by a mere reversal or transposition of parts or components, or a mere change in form without a change in function." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 671 F.Supp. 1369, 1399 (S.D.N.Y.1987), *aff'd*, 868 F.2d 1251 (Fed.Cir.1989). Defendant argues, however, that element 2 in Claim 34—"inserting an elongate implement having a sharp distal end axially into said elongate member *and said reciprocating member* until said sharp distal end is positioned inside said bearing surface and inside said elongate member distal end"— ought to be interpreted in light of the fact that Yoon amended the Claim during the prosecution of the patent specifically to include the words "and said reciprocating member." *See* Findings of Fact, No. 60.

Based on the credible evidence presented at the hearing, I find that Claim 34 means that the obturator should be inserted into the cannula and the shield *at the same time.* The fact that Yoon deliberately amended the Claim to include the limitation that the obturator be inserted into the cannula *and* into the safety shield suggests that it is proper to interpret the method Claim as requiring the simultaneous insertion of the obturator into both the cannula and the safety shield. Because it is impossible in the Surgiport to insert the obturator into the cannula and the safety shield at the same time, *see* Findings of Fact, Nos. 61 & 64, the Surgiport does not infringe Claim 34 of the '773 Patent.

---

5. Claim 34 reads as follows:
  A method for providing communication through an anatomical organ structure, comprising the steps of:
  [1] biasing an axial reciprocating member having a distal end bearing surface to assume a rest position with said bearing surface extending beyond the distal end of an elongate member encircling and receiving said bearing surface;
  [2] inserting an elongate implement having a sharp distal end axially into said elongate member and said reciprocating member until said sharp distal end is positioned inside said bearing surface and inside said elongate member distal end;
  [3] placing said reciprocating member against the cavity wall of an anatomical organ structure;
  [4] pushing said reciprocating member against the cavity wall until said reciprocating member assumes a suspense position between said elongate member and said elongate implement wherein said sharp distal end touches said cavity wall;
  [5] forcing said sharp distal end through said cavity wall until said bearing surface reaches the boundary between said cavity wall and the interior of said cavity; and
  [6] permitting said reciprocating member to assume said rest position within the interior of said cavity.
  PX 8 (DX 44) ('773 Patent), col. 23, line 56 to col. 24, line 13.

6. *See* Plaintiffs' Brief on '773 Patent at 8; Defendant's Memorandum on '773 Patent at 14.

504

### (iii) Doctrine of Equivalents

■ Under the doctrine of equivalents, "infringement *may* be found (but not necessarily) if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt,* 833 F.2d at 934 (footnote omitted and emphasis in original). An invention that is *not* "a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before," *Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 562, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1898), is *not* "pioneering," and such a device would be entitled to a narrower range of equivalents than would a pioneering invention. *See Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532–33 (Fed.Cir.1987); Findings of Fact, No. 62.

There are significant medical differences between the functioning of the Yoon trocar and that of the Surgiport, *see* Findings of Fact, Nos. 64–69, and these differences are sufficient to avoid infringement under the doctrine of equivalents. Whether the safety shield remains inside the cannula (as in the Yoon trocar) or is removed with the obturator (as in the Surgiport) has a significant effect on the width of the path of entry for endoscopes and other instruments. In order to use the same size instruments as with the Surgiport, a surgeon would be required to use a Yoon trocar with a larger diameter. The Yoon trocar would require an increase in the size of the incision. *See* Findings of Fact, No. 65. The safety shield in the Yoon trocar protrudes beyond the cannula while in the body, impairing vision during laparoscopy and permitting air leakage which can lead to painful complications. *See* Findings of Fact, Nos. 66–67. Furthermore, the Surgiport's cutting tip is protected when the obturator/safety-shield assembly is removed from the patient, protecting the surgical staff from cuts and diseases. *See* Findings of Fact, No. 69. In sum, the Surgiport does not infringe the '773 Patent under the doctrine of equivalents.

### (iv) Summary

For the reasons stated above and based on the full record before me, I find that plaintiffs are not likely to succeed in proving by a preponderance of the evidence that the Surgiport infringes Claims 50 or 34 of the '773 Patent or that the Surgiport infringes the '773 Patent under the doctrine of equivalents.

### c. *Conclusion*

For all of the reasons stated above, plaintiffs have failed to show that there is a reasonable likelihood that they will prove at trial by a preponderance of the evidence that defendant has infringed the '773 Patent. Although plaintiffs are likely to prevail on the question of validity—that is, defendant is not likely to prove by clear and convincing evidence that the '773 Patent is invalid—plaintiffs have not shown a reasonable likelihood of success on the merits of their infringement claim.

### 2. Irreparable Harm

■ A patentee who has made a strong showing of likelihood of success in proving infringement is entitled to a presumption of irreparable harm; however, this presumption is rebuttable. *Illinois Tool Works, Inc. v. Grip–Pak, Inc.,* 906 F.2d 679, 682 (Fed.Cir.1990); *Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1272 (Fed.Cir.1985). The court's conclusion that plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits arguably obviates the need for any further discussion. Even had plaintiffs made a *reasonable* showing of a likelihood of success—a conclusion which I believe is not supported by the evidence—the presumption of irreparable harm "requires at a minimum a *strong* showing of both patent validity and infringement." *Chrysler Motors Corp. v. Auto Body Panels, Inc.,* 908 F.2d 951, 954 (Fed.Cir.1990) (emphasis added).

■ Plaintiffs have presented evidence suggesting that defendant's continued dominance of the market will permit surgeons to become accustomed to using and buying the Surgiport. *See* Findings of Fact, No. 70. Surgeons, once they become

used to using a particular product, are not generally comfortable with switching to an equivalent product. *See* Findings of Fact, No. 71.

However, the credible evidence presented at the hearing does not support plaintiffs' claim of irreparable harm. First, plaintiffs waited over one year after acquiring the rights to the '773 Patent to file their motion for preliminary injunction, *see* Findings of Fact, Nos. 3 & 82, making implausible plaintiffs' assertions of serious, non-compensable injury. Even were it appropriate to apply the presumption of irreparable harm to this case, the presumption is substantially rebutted by the plaintiffs' delay in seeking an injunction. *See T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equip., Inc.*, 821 F.2d 646, 648 (Fed.Cir. 1987). Plaintiffs' argument that they wanted to wait until they had a product to offer in place of the Surgiport before filing suit nonetheless undermines their claim for extraordinary relief. If they could afford to wait over one year to bring suit when they had no product in the market, they ought to be able to wait until trial now that they have introduced their alternative to the Surgiport.

### 3. Balance of Hardship

■■■ Since the introduction of the Surgiport in 1987, defendant has developed the market through a combination of innovation and education. *See* Findings of Fact, Nos. 84–87. The effect on defendant of the issuance of the preliminary injunction would be devastating to its business. *See* Findings of Fact, No. 90.

Plaintiffs have argued that defendant has willfully infringed the patent and that it acted in bad faith throughout the negotiations with Yoon. *See* Plaintiffs' brief on '773 Patent at 15–20. The court has already concluded that, on the record as it currently stands, defendant has *not* infringed the '773 Patent. Therefore, there is certainly no question of a *willful* infringement. Furthermore, the credible testimony presented at the hearing suggests that USSC negotiated with Yoon in good faith and that the fact that no agreement

between USSC and Yoon was reached was at least as much Yoon's fault as it was defendant's. *See* Findings of Fact, Nos. 73–83. The balance of hardships on this motion does not tip in plaintiffs' favor.

### 4. Public Interest

■■■ While there are differences between USSC's Surgiport and Ethicon's Endopath, these differences are not substantial. *See* Findings of Fact, No. 89. Although USSC has certain products that are not yet available in Ethicon's product line, *see* Findings of Fact, No. 87, Ethicon's products are somewhat more flexible in that they are made to accommodate surgical instruments of more than one size, *see* Findings of Fact, Nos. 6 & 88. The public has an interest in competition between these two highly respected and innovative companies. Plaintiffs have failed to show that issuing a preliminary injunction that would force USSC to halt all production of the Surgiport would serve the public interest.

### 5. Summary

For all of the reasons stated above and based on the full record before me, plaintiffs' Motion for Preliminary Injunction (filed Aug. 15, 1990) is denied.

### B. *'030 Patent*

To prevail on its motion for preliminary injunction, defendant must show that (1) there is a reasonable likelihood that it will prove at trial by a preponderance of the evidence that Ethicon has infringed the '030 Patent and that it will bear its burden on the question of the patent's validity; (2) it is currently being irreparably harmed; (3) the balance of hardships tips in its favor; and (4) the issuance of a preliminary injunction is in the public interest.

### 1. Likelihood of Success on the Merits

In order to justify granting defendant's motion for preliminary injunction, the court must be satisfied that defendant is likely to succeed at trial to prove by a preponderance of the evidence both that the '030

Patent is valid and that Ethicon's Endopath infringes the patent.

### a. *Validity*

Ethicon's invalidity defense rests on two arguments: (1) Ethicon claims that the '030 Patent is obvious in light of the '773 Patent; and (2) Ethicon argues that the '030 Patent is invalid because the invention was "in public use" more than one year before the filing of the patent application.

### (i) Obviousness

■ Under the patent law, an invention that is "obvious" in light of prior art cannot be patented.[7] "The test is whether the subject matter of the claimed inventions would have been obvious to one skilled in the art at the time the inventions were made, *not* what would be obvious to a judge after reading the patents in suit and hearing the testimony." *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1092 (Fed.Cir.1985), *vacated on other grounds*, 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986). Plaintiffs claim that the cutting tip/safety shield configuration of the Moll trocar would have been obvious in light of the specification in the '773 Patent that the safety shield may "provide a smooth transition and thereby facilitate penetration of the inner and outer sleeves through a puncture wound." PX (DX 44) ('773 Patent), col. 15, lines 60–63. Defendant rejects this argument, insisting that it is the structure claimed in the patent—the triangular-shaped opening and the positioning of the retracted safety shield—not the purpose of the patent itself that ought to be the subject of inquiry on the question of obviousness. *See* USSC's Post–Hearing Reply Memorandum in Further Support of its Motion for a Preliminary Injunction (filed Feb. 26, 1991), at 2 & n. 2.

Based on the credible evidence at trial, I find that the triangular-shaped safety shield opening and the shield's position when fully retracted are not "obvious" in light of the prior art. *See* Findings of Fact, Nos. 94–96. Even if the question of obviousness were uncertain—and I do not believe that the evidence leaves much doubt on this score—the court ought to presume that the patent is valid absent "clear and convincing evidence" of obviousness. *See id.* at 1097; *see also Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985) (presumption of validity is particularly important where obviousness question is "close"). Defendant is likely to prevail at trial in proving that the '030 Patent was not "obvious" in light of prior art.

### (ii) Prior Use

■ Plaintiffs argue that the '030 Patent is invalid because there was at least one public use of the Endoport before February 24, 1985.[8] *See* Findings of Fact, No. 97. A public use is "any use of [the] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith*, 714 F.2d 1127, 1134 (Fed.Cir. 1983). Plaintiffs argue that the surgeons who used the Endoport in February 1985 did not sign confidentiality agreements and that, therefore, the Endoport was in public use prior to the critical date. In addition, they argue that prior laboratory tests had already demonstrated that the Endoport worked for its intended purpose and that the invention had already been "reduced to practice" by the time these alleged experimental uses occurred.

Under the patent laws, the period of "experimental use" *continues until after the* inventor "conducts tests needed to convince himself that the invention is capable of performing its intended purpose in its intended environment." *Gould Inc. v. United States*, 579 F.2d 571, 583, 217 Ct.Cl. 167

---

7. "A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (1988).

8. "A person shall be entitled to a patent unless ... the invention was ... in public use ... more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1988). Endo applied for the patent on February 24, 1986. *See* Findings of Fact, No. 92.

(1978); *see Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 550–51 (Fed.Cir.1990). Prior to the February 1985 experiments, Endo had not tested the Endoport on human beings. *See* Findings of Fact, No. 97. The credible evidence presented at trial suggest conclusively that these tests were experimental and that they were conducted confidentially. *See* Findings of Fact, No. 98. There was no *public* use of the Endoport before February 24, 1985.

#### (iii) Summary

For the reasons stated above and based on the full record before me, I find that defendant is likely to succeed at trial in proving by a preponderance of the evidence that the '030 Patent is valid.

#### b. *Literal Infringement*

█ Defendant has limited its claim of infringement to Claim 1 of the '030 Patent.[9] The questions on literal infringement are the following: (1) Does the Endopath have a pyramidal cutting head with a triangular base? (2) Does the Endopath's safety shield have a "triangular-shaped opening"? (3) Does the Endopath have "three generally parabolically shaped bevels"? and (4) Is the Endopath's safety shield in "general registry" with the base of the cutting head when the shield is retracted?

#### (i) Triangular Base

Defendant argues that the Endopath infringes the first element of Claim 1 of the '030 Patent because the Endopath's cutting tip "has a pyramidal portion, which has three planar surfaces." USSC's Post–Hearing Memorandum in Support of its Motion for a Preliminary Injunction (filed Feb. 5, 1991) ("Defendant's Memorandum") at 6. Plaintiffs argue that the base of the cutting head is cylindrical—not triangular—because the cutting tip merges smoothly into the obturator shaft. Plaintiff Ethicon's Post–Hearing Memorandum

9. The relevant portion of Claim 1 reads as follows:

[1] the piercing tip has a pyramidal cutting head that has a triangular base and
[2] the protective shield has a triangular-shaped opening to receive said head

of Law in Opposition to Defendant's Counter–Motion for a Preliminary Injunction— Corrected Copy (filed Feb. 21, 1991) ("Plaintiffs' Opposition") at 12.

The credible evidence presented at the hearing supports plaintiffs' interpretation of the language of the claim. *See* Findings of Fact, Nos. 102–03. There is no line segment connecting the proximal ends of the cutting edges of the Endopath which, when connected, would form the "base" of the cutting head. At a minimum, it is a close question. It is not now likely that defendant will succeed by a preponderance of evidence at trial to prove that the base of the Endopath "cutting head" is "triangular."

#### (ii) Triangular–Shaped Opening

Defendant argues that the Endopath infringes the second element of Claim 1 because the safety shield has a "triangular-shaped opening to receive [the cutting] head." The testimony at the hearing focused primarily on the question of whether the phrase "triangular-shaped opening" required a mathematically precise triangle— as in the case of the Moll trocar itself—or whether "triangular" simply means that it generally resembles a triangle. Plaintiffs have argued that the "opening" of the Endopath safety shield is three dimensional because it is cut out of a sphere. *See* Plaintiffs' Opposition at 2. A triangle is a two-dimensional figure; by definition, a three-dimensional opening cannot be triangular.

The credible testimony presented at trial supports plaintiffs' position. *See* Findings of Fact, Nos. 104–05. Defendant understands the adjective "triangular" to mean something less precise than the noun "triangle," and (at a minimum) this simply makes no grammatical sense. Even if the two-dimensional projection of the Endopath safety shield opening could be character-

[3] said opening being formed by the bases of three generally parabolically shaped bevels in the front edge of the shield and
[4] being in general registry with the base of the head when the shield is in said retracted position.
PX 25 (DX 102) ('030 Patent), col. 6, lines 11–17.

ized as "triangular," this projection does not represent the "opening" of the safety shield. The opening is three-dimensional; it is cut into a sphere. *See* Findings of Fact, No. 105. The opening is not triangular-shaped.

### (iii) Parabolically Shaped Bevels

Defendant argues that the Endopath infringes the third element of Claim 1 because it has a safety shield the opening of which is "formed by the bases of three generally parabolically shaped bevels in the front edge of the shield." Defendant argues that the Endopath has two sets of bevels: the "bulges" on the outside of the shield and the "generally parabolically shaped bevels" on the inside of the shield. *See* Defendant's Memorandum at 9. Although the Moll trocar itself has six parabolically shaped bevels (three inside, three outside), defendant argues that the Endopath infringes this element of Claim 1 because the Claim only requires that the opening be formed by three generally parabolically shaped bevels. *Id.,* n. 6.

Plaintiffs insist, however, that the purpose of the bevels is to provide a smooth transition between the tip and the shield in order to reduce penetration force, and this makes sense only if the bevels to which the patent refers are on the *outside* of the safety shield. *See* Plaintiffs' Opposition at 9. The credible evidence presented at the hearing generally supports plaintiffs' argument. *See* Findings of Fact, Nos. 106–09. Even if the "bulges" could properly be characterized as bevels that are parabolically shaped, the three-dimensional opening of the Endopath safety shield simply cannot be formed by the bases of these bevels.

### (iv) General Registry

Defendant's final argument on literal infringement is that the opening of the Endopath safety shield is in "general registry" with the base of the cutting head when the shield is in its retracted position. Plaintiffs argue that even if the base of the cutting head were properly considered to be "triangular"—a conclusion that the court has already rejected—the three-dimensional opening of the safety shield cannot be in general registry with the two-dimensional triangular base.

The credible evidence presented at the hearing supports plaintiffs' contention. *See* Findings of Fact, No. 112. Defendant argues that the tips of the three arcs at the distal end of the Endopath safety shield are in "general registry" with the base of the cutting tip, but the "opening" of the safety shield is not defined simply by the tips of the three arcs. The opening of the Endopath safety shield is three-dimensional, *see* Findings of Fact, No. 105, and it is defined by the curves of three arcs at the distal end of the safety shield. There is no question that the three curves of the arcs are *not* in general registry with the base of the cutting head.

### c. *Doctrine of Equivalents*

■ Defendant argues that, even if the Endopath does not literally infringe Claim 1 of the '030 Patent, the differences between them are so insignificant that the Endopath infringes the patent under the doctrine of equivalents. By having the opening of the safety shield conform to the pyramidal cutting head and by having the shield retract only to the base of the cutting head, the Moll trocar requires less force to penetrate the body wall. Defendant claims that the Endopath performs this same function—reduction of penetration force—in substantially the same way, by creating a relatively smooth transition from the cutting head to the safety shield and by retracting the shield only to the base of the head.

Plaintiffs assert that the Endopath safety shield does not perform the function of reducing the penetration force—indeed, plaintiffs suggest that the shape of the shield actually *increases* the penetration force. Instead, the "bullet-nosed" design was intended to reduce the trauma to surrounding tissue as the trocar is inserted into the body wall. *See* Findings of Fact, Nos. 114–16. Furthermore, the decision to decrease the distance that the safety shield would have to travel from its fully retracted position to a position fully covering the sharp end of the obturator and the decision to increase the force of the spring were

made for the purpose of minimizing the time it would take for the safety shield to cover the obturator point. *See* Findings of Fact, No. 116.

Defendant's reliance on the advertisement announcing that the Endopath was "designed for easy penetration" is misplaced, for this is perfectly consistent with plaintiffs' claim that the purpose of the Endopath's design was to accomplish a less traumatic penetration. *See* Findings of Fact, No. 118. Similarly, Ethicon's European patent application nowhere claims that the design of the Endopath's safety shield reduces penetration force. *See* Findings of Fact, No. 119. In sum, defendant is not likely to succeed at trial in demonstrating that the Endopath and the Moll trocar perform substantially the same function in substantially the same way to achieve substantially the same result.

### d. *Summary*

For all of the reasons stated above, defendant has failed to show that there is a reasonable likelihood that it will prove at trial by a preponderance of the evidence that plaintiffs have infringed the '030 Patent. Although defendant is likely to prevail on the question of validity—that is, plaintiffs are not likely to prove by clear and convincing evidence that the '030 Patent is invalid—defendant has not shown a reasonable likelihood of success on the merits of its infringement claim.

### 2. Irreparable Harm

■■■ Defendant relies on the presumption of irreparable harm that would flow from a strong showing of likelihood of success on the merits of its infringement claim. *See, e.g., H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987). As in the case of the '773 Patent, the moving party has failed even to make a *reasonable* showing of likelihood of success on the merits; without a *strong* showing, no presumption of irreparable harm is warranted. *Chrysler Motors Corp. v. Auto Body Panels, Inc.,* 908 F.2d 951, 954 (Fed.Cir.1990).

Defendant claims that it has presented independent evidence of harm for which no amount of monetary relief would be sufficient compensation. Defendant's Memorandum at 17. While it is certainly possible that USSC may lose customers to Ethicon as a result of the Endopath's "bullet-nosed" safety shield, this would not, standing alone, constitute irreparable harm to a company controlling approximately 95% of the total market. *See* Findings of Fact, No. 70.

### 3. Balance of Hardships

■■■ Defendant argues that, because Ethicon has been in the disposable trocar market for a comparatively short period of time and because Ethicon would not be prevented from reintroducing a disposable trocar with a different tip and safety-shield configuration, plaintiffs would not suffer undue hardship were defendant's cross-motion for preliminary injunction granted.

Defendant currently controls most of the market for disposable trocars, and should the court grant its motion, it would effectively enjoy a monopoly until plaintiffs were able to reintroduce an alternatively designed trocar. *See* Findings of Fact, No. 122. Under these circumstances, I cannot conclude that the balance of hardships tips in defendant's favor.

### 4. Public Interest

As already discussed with respect to the '773 Patent, the public interest in a free and open competition between two exceptional companies is significant. While "public policy favors protection of the rights secured by the valid patents," *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983), the court has already found that defendant is not likely to prove at trial that its "rights secured by the valid patent" are being infringed by plaintiffs' trocar. Under these circumstances, the public interest is in the continuing competition between the parties.

### 5. Summary

For the reasons stated above and based on the full record before me, defendant's

**510**

Motion for Preliminary Injunction (filed Aug. 16, 1990) is denied.

### IV. CONCLUSION

To summarize:

(1) Ethicon is reasonably likely at trial to sustain its burden in showing that the '773 Patent is valid;

(2) Ethicon is *not* reasonably likely at trial to prevail on its claim of infringement;

(3) Ethicon has failed to show that it is being irreparably harmed by USSC's sale of the Surgiport;

(4) Ethicon has not shown that the balance of hardships tips in its favor; and

(5) Ethicon has not shown that this injunction would be in the public interest.

For all of the reasons stated above, plaintiffs' Motion for Preliminary Injunction (filed Aug. 15, 1990) is DENIED.

(1) USSC is reasonably likely at trial to sustain its burden in showing that the '030 Patent is valid;

(2) USSC is *not* reasonably likely at trial to prevail on its claim of infringement;

(3) USSC has failed to show that it is being irreparably harmed by Ethicon's sale of the Endopath;

(4) USSC has not shown that the balance of hardships tips in its favor; and

(5) USSC has not shown that this injunction would be in the public interest.

For all the reasons stated above, defendant's Motion for Preliminary Injunction (filed Aug. 16, 1990) is DENIED.

It is so ordered.